about the exhibits. We don't usually accept things the day of argument, but I understand everything was included in the record excerpts except for exhibit number two, right? So we won't consider that. We've called the clerk and we're told we could bring them this morning. We had asked how to apologize for they're not terribly helpful. Okay, I'll address three main points. First, sections one and three of the policies are the only terms addressing when excess coverage begins. Coverage is triggered when the retain limit is met, period. The only question is whether some other policy provision clearly and unambiguously limits how coverage is triggered. Second, nothing in section 3D has to do with where coverage starts. That section simply has no application to the facts of this case, which means there is coverage under sections one and 3E of the policies. And third, underwriters attempt to use section 3D to claw back coverage would render other policy provisions meaningless and yield absurd results, so it must be rejected. I'll start by addressing how coverage works under the umbrella policies, which is clear from sections one and 3E. Section one explicitly addresses coverage. It states that underwriters will pay on behalf of the insured those sums in excess of the retained limit that the insured becomes legally obligated to pay. And the underlying term. Section one then also states that the amount underwriters will pay for damages is limited as described in section three. The only provision in section three that addresses retained limit is section 3E. That section repeats that underwriters will be liable for damages in excess of the retained limit. And section 3E1 then defines the retained limit as the total limits of the underlying insurance. Section 3E concludes that underwriters will pay in up to an amount not exceeding the each occurrence limit, which is set out on the first page of the policy in the declarations. That is everything that you need to decide when coverage starts. Nothing in section 3E or anywhere else in the umbrella policies takes that coverage trigger away or limits it. And underwriters can't use section 3D in an attempt to negate coverage by implication. Nothing in the policies unambiguously changes the coverage trigger in sections one and 3E. Other parts of section three define the most, meaning the upper limit that underwriters will pay. That's sections 3A through 3D. But only section 3E deals with when coverage begins, and section 3E is the only part of the policies that deals with the retained limit. It's informative that underwriters don't dispute any of the there would be no dispute that there is coverage here, and that underwriters would have an obligation to pay. So the question then is whether section 3D clearly and unambiguously limits the coverage trigger that sections one and 3E provide by somehow restricting the way in which the retained limit can be met. Describe what was the nature of engagement before the district judge on this issue? Was there a hearing on this point? I don't know if there was an oral hearing. Certainly it was well-briefed. There were motions. You don't know if there was an oral hearing? I do not know if there was an oral hearing, Your Honor. I don't believe there was. There certainly is not a transcript of it in the record. But I know it was extensively briefed before the district court and all these issues were raised. Actually, did you submit any claims for removal of debris under the general policy? At the time of the hearing in the district court, none of that had been determined because the parties were still submitting under the excess package. So there's nothing about that in the record. The second paragraph of 3D is what's sometimes called the drop-down provision, and that in no way confines or limits the retained limit above which underwriters has to pay. It doesn't mention the retained limit. It has no limiting language. It has no negating language. And it doesn't in any way hint of taking away the coverage trigger in sections one and 3E. But they cite Westchester, which I'm sure you'll get to. But the second case that they cite with the CF is the Colony, what's it, Colony National? Yes. Which seems to be the policy argument that they're concerned about, which is that under 3D-2, if there were exhaustion, that would, your position is that that would create them as a primary insurer? If there were exhaustion as provided in 3D, and our position here is the condition preceding isn't met. Yeah, I know, but if it were met, they would be the primary insurer. That's your position. Under the second paragraph, subpart two, yes, Your Honor, that's right. And also responsible for defense. Yes, Your Honor, that would trigger as part of it. There's also a separate defense provision in section two of the policy, but I think it would also be triggered under this provision of subpart two of 3D. So if you look at it as plain terms, the second paragraph of 3D only comes into play when the condition preceding is met and that hasn't been met here. The second paragraph talks about what happens if underlying insurance is used for claims that are covered by the umbrella policies, but as written, it doesn't apply unless the condition has been met, and it's undisputed by the parties here on this record that it has not been met. This means based on the facts of this case, section 3D has no application, and it means section 3D, therefore, cannot limit or take away the coverage that's provided by sections one and 3E. At the least, underwriters haven't met their burden to show that section 3D clearly and unambiguously wipes out the entirety of W&T's coverage under the umbrella policies. In essence, they're arguing that this is a gotcha, which is exactly the sort of things courts disfavor from insurers. Underwriters' argument also floor and make it clear that coverage starts when the retained limit's met. Section 3D, like sections 3A through 3C, talk about the most that underwriters will pay or the ceiling. The first paragraph of 3D sets out the notion dealing with the each occurrence limit, which is stated in the special declarations and stating that that's the most underwriters will pay. Then you come to the second paragraph of section 3D, and that describes the circumstances in which underwriters will drop down to cover additional obligations. The circumstances of the second paragraph of section 3D described doesn't come into play here because W&T is not asking underwriters to drop down, but simply pay above the retained limit as that's defined in sections one and 3E of the policy. This provision in section 3D has nothing to do with the coverage issue here and has nothing to do with when excess coverage begins under these policies. This case simply has nothing to do with section 3D. Underwriters' argument is that the condition preceding hasn't been met, and W&T agrees with that on the facts of this record. The disagreement is over the effect of that condition preceding not being met. I read your brief. The core of your argument is that the district court confused the drop down provisions with coverage. Is that fair? I think that's fair. He used it to redefine the retained limit. Was the argument to the district court expressed in those terms about the distinction, the fundamental distinctions between drop down and coverage and the treatment? Yes, Your Honor. We clearly pointed out where coverage arises under the policy. We responded to underwriters' summary judgments whenever they argued exactly as Judge Hoyt found that you can only reduce the retained limit by a claim that's covered under the umbrella policy. We pointed out that section 3D simply doesn't say that, and coverage is triggered under sections 1 and 3E of the policy. If underwriters really wanted to achieve the result that they're claiming here, they could have done that by putting lat language in the policy, and they mistakenly rely on the Westchester case. The policies in Westchester had a separate endorsement that used limiting language that specifically defined when payments would not count in deciding if the underlying limits of insurance had been reduced or exhausted. That was the clause that the court found relevant in the Westchester decision, and it says that where underlying insurance is reduced or exhausted by claims that are not covered by the excess policy, then the policy will apply as if the underlying insurance has not been reduced or exhausted. So it's a different condition precedent. Are those common and two distinct industry? You've got the Ohio case you cited, Sarker v. Love. Yes, Your Honor. Similar language to here, not limited, and you're saying Westchester is easily drafted and would be therefore limited. That's a standard policy endorsement that can be added to the policy, and that changed the language of the policy. That's why it was added as an endorsement. I mean, that's a standard industry endorsement, and it has a different condition precedent, and it's also clear that after the conditions met, the action that's being taken is very different because in that endorsement, it says that the aggregate limit is not reduced, and that's very different than the language of 3D. 3D talks about paying in excess of the reduced underlying limit. So that's why that endorsement operated clearly and plainly to change the policy, and if underwriters wanted the result that they're arguing here, they could have done it simply by adding that endorsement. Well, it would change the coverage, but it would also change the price, right? It would change the price, but if they limited it, that should . . . It may change the price. I guess the question is, if that had been fully disclosed, could they have sold the policy? In this industry where the structure and the mechanics of recovery would be frustrated by that? I think that, to me, is a fundamental question that needs to be answered here because, anyway, that's . . . I think, Your Honor, they probably couldn't because if you look at the nature of the industry and what's going on, whenever you have a catastrophic event like a hurricane come through, you've got offshore platforms damaged. What's the first thing you have to do? You have to make the wells safe. You have to go in and do that. You've got to deal with plugging and abandoning wells, and you've got to deal with avoiding pollution. That's the first thing that's got to happen. We've had a few of these erupting wells here lately. Yes, Your Honor, I know you have, but that's exactly why these policies are structured like this because that's the first thing W&T has to do is they have to go in and make the operators' extra expense, entering the wells, plugging and abandoning the wells, and dealing with those issues because that has to be dealt with first. The last thing that's dealt with is the removal of wreck and debris. Once everything else is done, they then can determine what has to be removed. Sometimes they have to actually set aside parts of the platforms to go in and make the wells safe, and they leave all of that and they deal with that last. This policy package is structured so that W&T had $150 million in coverage to deal with what it had to do, and if it didn't have enough coverage under the energy package to deal with what came last, it was $1 million plus $10 million plus $150 million, but if there was still work left to be done above that $160 million retained limit, then it was going to be for removal of wreck and debris because that's what comes last, and that's exactly what this policy was purchased for, was for removal of wreck and debris. So it's ironic that underwriters now come in and say, you've got no coverage for removal of wreck and debris, when there's specific endorsement on this policy to do exactly that, and under these facts, it would render this coverage basically illusory, which is an absurd result, and that's an additional reason that underwriters' reading shouldn't be credited. So where does all this leave us? Underwriters' interpretation ignores the text, renders other policy provisions meaningless, and makes coverage illusory. On the other hand, W&T's interpretation is faithful to the text of the policies and gives effect to all of the policy conditions, but at the least, to the extent the court finds that Section 3D is less than clear, Texas law nevertheless favors coverage whenever there's an ambiguity. Underwriters haven't met their burden to show that Section 3D clearly and unambiguously claws back the coverage trigger that Sections 1 and 3 provide, and at the very least, W&T's reading is a reasonable one. For these reasons, this court should reverse the judgment of the district court.  We have a few minutes for rebuttal. Mr. Roger, you're on. Mr. Johnson, reading these briefs, I was left with this basic question. I wanted to share it with you before it's worth framing your argument. This is a complex and highly structured insurance program that this company went through to buy an insurance package. It's carefully framed to try to anticipate the risks that they really ultimately realize and those losses. It struck me as being difficult to imagine why in the world you would go through that very elaborate structuring, which was obviously done by the insurance specialist, and end up with a coverage, as you contend for here, which is none coverage. In other words, they got nothing under this construction. Perhaps that's the way it ought to be, but it would follow that this is an extraordinarily foolish mistake they made in structuring this policy. Let me start with that argument before I get into the policy provisions, because that is a critical argument that they make, that the policy is illusory. There is nothing illusory about this policy whatsoever in these circumstances. Just remember that this is 2008 Hurricane Ike, which was the fourth busiest hurricane season ever. This coverage follows the 2005 year, which everybody on this court, everybody in Houston certainly knows well, because there was $159 billion worth of damage in that hurricane season. There were three, and that was three times prior limit, there were three storms that were of the most intense ever in the Atlantic. After the two storms, Dennis and Emily, which were Cat 4 and Cat 5, you had Katrina, which was the seventh most intense storm ever, which this court certainly knows. Rita, we certainly know in Houston, was the fourth most intense ever. Then there was Wilma, which was the most intense Atlantic storm ever, and my friends in Florida really know about that one. Companies like W&T put insurance programs like this one here. Let's look at that energy package. It's got $544 million of coverage for platforms, $65 million of coverage for pipelines, and many millions more for other structures. Then it covers operator's extra expense, and it's got removal of debris coverage in it. That removal of debris coverage has a separate limit. That limit is 25% of each of the items, 25%. Now, the problem is that when we have catastrophic situations, like named storms, and there's named storm separate coverage in here, they bought a bucket. They bought a bucket, $150 million over 10, and then there's $1 million of liability above that. They bought a bucket of $150 million, and they bought excess over $160 million in the excess liability policies. Now, the problem is oil and water, cats and dogs, property damage, first party, and liability coverage, these are things that don't mix that well. They bought a bucket here because they wanted the right to choose. It's going to be OEE, you need that immediately, as they said, property damage, removal of debris, and they bought a bucket. Now, when you buy a bucket like that, and it covers all of these items, every dollar you put on that's expensive, so you need to figure out. Now, they have $500 million on their property damage, but in the case of a named storm, they've only got $150 million because every dollar counts. Now, you know when you talk about what's illusory or not illusory? They've got over $600 million of property coverage. If their contention is correct, then what other insurance? In other words, what other insurance? You were saying that, in effect, as an aggregate, this is a drawdown kind of thing. You can choose how you spend the money. Now, what happens if, in fact, they're correct? They're going to get insurance beyond that? I mean, in other words, it appears on the face of the briefs that it's the sequencing of the claims and not the fact of the claims that matter here. In other words, you're suggesting that it's sort of implied that there's an aggregate amount of money available, and they just spend it unwisely. And they're saying, no, it's the sequence in which we do this, and we cannot sequence these in the real world the way they're talking. It's just a matter of buying insufficient coverage. They could have bought more coverage. They could have bought more coverage in that, but that's expensive. If they had had more than $150 million in property damage, they had 150 platforms damaged, 12 of them, 14 of them toppled. They could have had way more than $150 million in property damage. They would have been uninsured for that. That's because they chose what they were going to do. And when they chose ROD, when they chose the removal of debris, each one of the limits, if it weren't a named windstorm, was 25% of the value, 25% of the value. So when they place their excess coverage, you know what $160 million is? That's 25% of the property damage. There is nothing illusory whatsoever about starting your coverage for the liability for removal of debris when you've got 150 platforms out there buying that at $160 million. There is nothing illusory about that whatsoever. So now when you go to the – let's look at the insuring agreement. Go back and start from the beginning now because there's nothing illusory about this whatsoever. This is a conscious choice you make because every dollar counts. So let's look at the insuring agreement, the coverage grant in Section 1. We will pay on behalf of the insured those sums in excess of the retained limit that the insured becomes legally obligated to pay by reason of liability imposed by law. This is an excess liability policy. It covers liabilities in excess of $160 million. Their liabilities are 50. They don't come close to exceeding the retained limit. There's no argument that they can exceed the retained limit. They've only got $50 million in liability. But then you look at 1, 2, and 3. 1, 2, and 3 integrate perfectly. They fit together perfectly, 1, 2, and 3, because number 1 says you pay in excess of the retained limit. Number 2, 3E tells you what the retained limit is. And 3D says when it is reduced or exhausted. Now they're under the mistaken impression that you pay either above the retained limit or below the retained limit. You never pay below the retained limit. The retained limit, you always pay in excess of the retained limit. That's why 3D is in the policy. 3D says, and you know what's interesting about 3D is, and this is why their argument about 3E standing on its own can't work. You get 3D. 3D is the section 1, the coverage, says we will pay. 3D says we will pay. 3E is nothing but a definition of retained limit. It doesn't say you're going to pay. There are many flaws with that argument. The first one is it's not an irony that 3D is a payment provision. It's not an irony that 3.1 is payment. And it's not an irony that 3E is just a definition of retained limit. You always pay above the retained limit. That's why 3D comes in. And 3D says if it's exhausted, it drops all the way down. If it's reduced, it drops partway down. But that tells you what the retained limit is in a single case. If they had liability claims of 100. Is it correct looking at those limits that the cases you rely on or the district court relied on exclusively, Westchester and for, what is it, Colony National? Yeah. Drop-down positions there were explicit that the underlying limits wouldn't be exhausted by claims unless they were in your excess policy. And that's a distinction here, correct? It is a distinction that one can make in the sense of our policy directs when it drops down as opposed to saying when it does not drop down. True. But the point is within the coverage grant, within the coverage grant, you only pay in excess of the retained limit. And 3D says when it is reduced or exhausted. If it is not reduced or exhausted, where's the $161 million in liability claims? There isn't any. When you look at it in context, you have to have one, two, and three, and they match perfectly in this context. Now, when you look at Westchester, Westchester absolutely supports the argument in this case. It is true that the language in Westchester was phrased in the negative. It was only phrased in the negative because it began with the endorsement that they could have bought, the endorsement that said we will drop down for occurrences, whether they're covered or not. Because it had that endorsement, because it had that provision for its 3D, the endorsement had to read that in the negative to negate that, to get to the same position as it is in the present case. In contrast, this is complete harmony because it says this is the retained limit, $161 million, and this is when it's reduced or when it's exhausted. And that matches perfectly. Well, it doesn't say this is when it's reduced. It says if the following, then, correct? Correct. So, but that's the same logic in the case that I mentioned to opposing counsel, the Ohio decision. That's an incorrectly decided case? Well, there are two things about SARCA that I would talk about. Number one is the fact that the quote, the provision that they have in their insurance agreement does not say that it's subject to the limitation in Section 3. It doesn't say that, and that's exactly where 3D is in our case. And so that means that it has absolutely no application here. But when you look at Texas law in the Stevenson-Westchester fire case, remember that in that case, that case had the same insuring agreement, same terms. It had similar 3D backwards because it had to be in the negative. And it had the 3E definition, had the same 3E definition that we have here, a combination of the underlying being the named underlying, scheduled underlying, and other policies that covered. So if, under that case, if under Texas law, 1 and 3E are everything, then you would need the drop down or not. As I said, it's irrelevant. The point is it is relevant because the policy, the limits are either exhausted or they aren't exhausted. If they're exhausted, then you pay above the exhausted amount. If they're reduced, you pay above the reduced. You always pay above the retained limit. It's only a question of what is that retained limit. Is it reduced or not? And this policy states precisely when it is and when it is not reduced. Now, you can argue that the second part of 3D is an add-on. The part that says it will actually be the primary insurance. It's actually covered already in the duty to defend under the same circumstance. Where under the same circumstance it says we have a duty to defend when the primary, the entire limits are exhausted by claims that are covered under the policy. Which, of course, matches up the second part of 3E and Section 2. But then you would always have a duty to defend. Pardon? Then you would always have a duty to defend. When it's exhausted by claims covered under the policy. The policy says that in both sections, 3E2 and in Section 2. It has to be claims covered. So that creates an incredible inconsistency here in their interpretation. Because if claims that are covered under the policy exhaust or limit and claims that are not covered do also. Then, number one, you have to read 3D1 out of the policy because that's unnecessary. Because that's an exact situation that is covered by claims that are covered. Claims that are not covered would be there also. So you just have to take that out of the policy. That has nothing to do with anything. It comes out of the policy. And secondly, then, you get an incredible inconsistency because you have a duty to pay but no duty to defend under the identical circumstances. Because the duty to defend only drops down as everything in this policy does when it is payment of claims that are covered under this policy. Now, the next thing that I want to talk about is I want to talk for a minute about the Westchester fire case in more detail. Because as I said, the critical point about that was that you needed to be in the negative because it had already put a drop-down provision in there. And that was the only reason it did that. But Westchester fire has section one, the same coverage. It has number two. It has the same retained limit. So the Texas court still applied 3D. If you don't need 3D at all, then there's no reason why Westchester fire would apply the 3D endorsement in that case. So the same was true in the California versus Stimson case. In that case, the court said only when the limits are exhausted by a covered claim and that claim is covered under the excess policy is the payment triggered on the excess policy. Now, the final point I want to talk about briefly is contra proferentum. And the point about that is that's the old Hail Mary, only I don't see Doug Flutie here today. But it's not a correct statement of Texas law. Because number one, the only time that applied under Texas law was in the event of an exclusion. And 3D is not an exclusion. It tells you when the policy pays. It states these specific circumstances where the policy pays. And as noted, but the other question is it has to be ambiguous before it applies. Now, the Texas courts and the Texas Supreme Court said this in Barnett versus Aetna Life Insurance Company. And that's at 723 SW 2nd 663 at 666. The court gave you the rule for construction of policies. And that is number one, we construe them by contracts. If both parties' interpretations are reasonable, the policy is ambiguous. And then we go to rules of interpretation. What are those rules? And the court set them out. One of them is a justum generis, which is not applicable in this case. The next one is that we have to give each part of the contract meaning. And they won't give 3D meaning. 3D is the only situation where the policy deals with what exhausts or does not exhaust. Because remember, if the policy is exhausted by payment of claims, then it drops down. And it drops down when? When claims are covered under the policy. It doesn't drop down otherwise. So there's either exhaustion, reduction, or there's nothing. Because that is when you pay under Section 3D. And so we have to give meaning to every provision of the policy. They cannot give meaning to 3D1. Secondly, the Supreme Court said, finally, generally, this is their term, generally, the language and terms of policies are chosen by the insurance company. So they're construed against it. Now, in this case, as the record shows from the Lori affidavit on page 120 of the record, that the W&T participated in the negotiation of the coverage terms, conditions, and limits. But that's aside. The Sternberg affidavit makes clear that the broker actually issued the policies. And when you look at them here, you can see the broker actually issued and they were, and chose the meaning of the, or chose the terms that were in there. But their objection to that is that that was not, and this is their term in the Parchois affidavit, it was not manuscript. That's right, it wasn't manuscript. They chose it. The broker chose and put this package together and did that. But they didn't, they didn't manuscript it. That's not what the Texas Supreme Court said. It said the insurance company chooses it, then it's construed against them. And that's what the Vought case from Chief Judge Fitzwater said, which is cited in our brief at page 38, that when it's drafted by the broker, the policy is not interpreted against the insurance company. And Judge Higginbotham, you remember that from our argument in Gubarek, where you ruled exactly the same way and the same facts in that case. And that's cited in our brief at page 38 too. And it's a great opinion, of course. Now, in conclusion, the language of the excess policies is unequivocal because it only provides one time when the policies are reduced or exhausted. It's only in one place. There's only one situation where that occurs for claims that are covered under the excess policies. W&T made a deliberate choice to purchase catastrophic coverage, which had a limit of 150, and then the removal of debris kicked in at 161 million. There was nothing illegal, immoral, unethical, or fattening about that, but the problem is that it left a gap in this particular case. As the Westchester Fire Court said, it's not the job of the policy or this court to fill those gaps. The hurricane showed that that was insufficient, but insufficient doesn't mean that you have to step in because Texas law says the court gives the parties the benefit of their bargain. W&T asked this court to actually change the bargain that they actually entered into because they want a policy they didn't buy. That's why we respectfully pray that this court affirm in all respects the judgment of the district court. All right. Thank you, sir. Mr. Harris, you have a few minutes. I'll briefly address three issues. First, turning to Westchester Fire, Underwriters wants to argue that the endorsement of Westchester Fire operates just like Section 3D in this policy, but we know it doesn't do that because the Westchester Fire policy in the policy itself also had a provision that was materially similar, materially the same as Section 3D here, so we know that the endorsement was something different. It very clearly limited when the retained limit could be reduced, and it was very clear after the condition that the aggregate limit is not reduced if that condition is met, and there's no language like that in our policy. Second, addressing the Sarka v. Love case that Judge Higginson asked about, the language that's quoted from the policy there is identical to the policy language in this case. We don't have the full policy quoted, but we do have Section 3D in sub 1 and sub 2, and it's quoted on page 3 of the Sarka case. It's identical to the language here, and the court there got it exactly right when it said this provision is not a condition preceding to coverage. It is a scenario in which payment would be made. It is not an absolute certainty of all payment policies. That is an additional trigger that could trigger coverage, but it's not a condition preceding to coverage itself, and the Sarka case got that exactly right. And finally, I want to emphasize that underwriters' interpretation of the umbrella policies leave several things unexplained. First, they never explain how the condition preceding in Section 3D is met. Second, they never explain— That's interesting. It's not at all written as a when to pay. It's written as if the following, then. Exactly, Your Honor. It is an additional trigger. That's exactly what the court said in Sarka v. Love. If the condition is met, then underwriters will take on additional duties under sub 1 to pay and under sub 2 to continue in effect as underlying insurance. The condition isn't met, so we don't get to those. But if it is met, then under sub 1, it's pay in excess of the reduced limit, whereas the endorsement that was added in Westchester says if the condition is met, then the aggregate limit is not reduced by these claims. Two very different provisions, very different language, and we know those don't mean the same thing because 3D is similar to the provision at Section 5E or F in the Westchester fire policy itself, in the umbrella policy. And going to exactly that point, underwriters never explains how this language in Section 3D limits or negates when coverage is implied. They never explain the conflict between Section 3E2, and that deals with when the retained limit is satisfied by a self-insured insurance retention. Section 3D only deals with policy coverage, and the retained limit can be met in two different ways in this case, and they never explain that conflict, and they never explain the other conflict raised in our brief dealing with Section 6P, which is making clear under that provision that the retained limit is the trigger for coverage, and it's not Section 3D. Underwriters can't call W&T's view unreasonable without even trying to explain all these problems their interpretation of the policy creates. Their reading of the policy doesn't work and isn't reasonable. W&T's interpretation of the policy is reasonable and accounts for all these provisions. This court should reverse the district court's judgment. All right. Thank you, Mr. Harris.